UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

    -against-

JORLY CRUZ,

                  Defendant.
-------------------------------------------------------------X

**REPORT AND RECOMMENDATION**

20-CR-321 (GRB)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this criminal matter, on referral from the Honorable Gary R. Brown for Report and Recommendation, is Defendant Jorly Cruz's ("Defendant" or "Cruz") motion to suppress physical evidence seized by, and incriminating statements made to, law enforcement before and during a search of Defendant's residence, on the grounds that: (i) the search was illegal; and (ii) the statements were unlawfully coerced by law enforcement. *See* Defendant's Motion to Suppress Physical and Statement Evidence ("Defendant's Motion" or "Def. Mot"), Docket Entry ("DE") [42].

By way of sealed Complaint filed on March 11, 2020, the United States Government (the "Government") charged Defendant with: (i) possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and (ii) knowing and intentional use and carrying of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Sealed Complaint ("Compl."), DE [1]. The Complaint was subsequently unsealed on April 27, 2020. *See* DE [9].

For the reasons set forth below, the Court respectfully recommends that Defendant's Motion be denied in its entirety.

## I.    FINDINGS OF FACT

In opposition to Defendant's Motion, the Government offered the testimony of four witnesses in its case-in-chief – Detective Thomas Corso, Detective Christopher Marksberry, Detective Sean Manning and Officer Michael Filippazzo – and one on rebuttal – Special Agent Michael Cassidy.  The relevant testimony of these witnesses, all of whom were credible, as well as that of the witnesses offered by Cruz, as detailed below, constitute the Court's Findings of Fact.

### A. The United States Marshals Service New York/New Jersey Regional Fugitive Task Force

The United States Marshals Service New York/New Jersey Regional Fugitive Task Force (the "Task Force") locates and apprehends "high risk" fugitives within its geographical parameters.    *See* Suppression Hearing Transcript ("Tr.") 4:20-23. According to Detective Corso – a 20-year veteran of the Suffolk County Police Department ("SCPD") who has been assigned to the Task Force since 2016 – the dangerous nature of the Task Force's mission necessitates that its members equip themselves with, among other things, ballistic vests and helmets and jackets identifying them as police.  *See* Tr. 3:20-4:17, 7:25-8:13, 70:4-6.  Upon being notified of an outstanding warrant, Task Force members familiarize themselves with the subject's background and attempt to collect information that could assist the Task Force in locating and apprehending the individual, including his/her criminal history,

gang affiliations, names and addresses of relatives, and any recent criminal activity. *See* Tr. 6:5-7:19.

When Task Force members approach a location, their firearms are drawn and directed toward places from which the sought individual could escape or launch an attack. *See* Tr. 8:22-24. If Task Force members encounter individuals other than the sought individual, who appear not to pose a threat to officer safety, the officers' firearms are directed away from the person while questioning is attempted. *See* Tr. 8:25-9:4. According to Detective Corso, questioning is normally limited to determining whether the interviewee knows the subject and to obtain permission to check the location for him/her. *See* Tr. 10:7-14.[1]

If consent is obtained, Task Force members search areas "where the subject would reasonably be hiding," such as "a closet, under a bed, [or] behind things like refrigerators or dressers." Tr. 11:10-13. Because its mandate is limited to locating and apprehending fugitives, if, during a search, Task Force officers encounter illegal drugs or an illegal firearm, they notify the SCPD's Firearm Suppression Team ("FAST Team"). *See* Tr. 12:9-15. If the sought individual is not at that location, and to avoid evidence tampering, Task Force officers secure the location until FAST Team detectives can respond. *See* Tr. 13:2-4.[2]

---

[1] Detective Corso testified that because of the nature of these interviews, Task Force members do not contemporaneously document them or carry written Permission to Search forms, because the process of documenting consent could provide time for the fugitive to attack the officers. *See* Tr. 10:19-22, 91:21-23.

[2] According to Detective Corso, there is "no reason" to bring a civilian into a secured location, as doing so presents a risk that the civilian could gain access to the firearm or attempt to destroy drugs and other evidence. *See* Tr. 14:6-10.

### B. Search for Bernard King

At approximately 5:00 a.m. on March 6, 2020, Detective Corso and approximately 12 other law enforcement officers – some Task Force members and some police officers assigned to the FAST Team – met in the parking lot of the SCPD's First Precinct. *See* Tr. 16:12-17:4, 40:20-22, 64:21-25. They were tasked with locating and apprehending Bernard King ("King"), a parole absconder and known Bloods gang member with prior weapons and narcotics convictions who was wanted by SCPD's Third Precinct for allegedly firing shots into the home of a girlfriend. *See* Tr. 14:15-15:23. During that meeting, Detective Corso circulated a photograph of King and conveyed King's background to the other officers. *See* Tr. 16:14-16. From there, the group first traveled to 12 Birch Street in North Amityville, the residence of King's parents. *See* Tr. 17:8-14. At 12 Birch Street and all subsequent locations, Detective Corso was designated as the first officer who would enter a residence, if necessary, and as such, he carried a ballistic shield approximately three feet tall by two feet wide with a triangular ballistic window. *See* Tr. 8:5-9, 17:5-7.

Upon approaching 12 Birch Street, the officers knocked and obtained oral consent from King's mother to search for King. *See* Tr. 17:17-23. While Bernard King's father, Sandy King, testified that the officers did not ask his permission to search his home for Bernard, he conceded that his wife was the one who answered the officers' knock at the door, while he remained in bed. *See* Tr. 377:24-25. His wife did not testify.

As the officers did not find King at 12 Birch Street, *see* Tr. 17:19, they next traveled to 7 Ephesus Street in North Amityville, where Yesenia Youngs ("Youngs"), the mother of one of King's children, resided. *See* Tr. 18:4-9. The officers and Youngs disagreed as to whether she consented to a search, but as this search is not at issue in this motion, the Court need not resolve this dispute. *Compare* Tr. 18:10-22 (officers obtained consent from Youngs) *with* Tr. 389 (Youngs denied giving consent to the officers to search her house). After the search, Youngs directed the officers to the home of Devonte Carpenter ("Carpenter"), whom officers knew was a Bloods member and close associate of King. *See* Tr. 19:3-7, 391:9-11. The officers already knew that Carpenter had previously resided at 4 Madison Avenue in North Amityville (the "Residence"), and traveled there next. *See* Tr. 136:24, 138:18-22. [3]

### C. Search of 4 Madison Avenue, North Amityville

The officers arrived at the Residence at approximately 6:40 a.m. and observed several cars parked in the driveway, indicating that multiple people were present inside. *See* Tr. 19:13-15, 82:17-25. The FAST Team officers established a perimeter around the Residence, while approximately three Task Force officers, including Detective Corso and Detective Brian Grazidei, approached the front door. *See* Tr. 19:17-20:7. At the front door, Detective Corso observed a Hispanic male – later identified as Cruz – looking out a first-floor window. *See* Tr. 20:22-21:9. At this point, the testimony diverges.

---

[3] As neither Sandy King nor Youngs was present at the search of the 4 Madison Avenue Residence, their testimony is otherwise of limited relevance to Defendant's Motion.

According to the Government's witnesses, Detective Grazidei knocked on the door and a black male, later identified as Hiklyn Ortiz ("Ortiz"), answered and stated to the officers that he had only lived at the Residence for a few days and did not know King. *See* Tr. 19:20-24. At the same time, an elderly white woman, later identified as Irene Totok ("Totok"), also emerged from the second floor of the Residence. *See* Tr. 19:24-20:1. Totok also told the officers that she did not know King. *See* Tr. 20:2. Nonetheless, the Task Force officers requested – and received – permission from Ortiz and Totok to search for King inside the Residence. *See* Tr. 21:16-23, 96:16-19.

Ortiz and Totok offered different testimony. Ortiz – who has a long history with drugs, drug crimes, ignoring court orders and lying to the court – claimed to have been awoken by police officers inside his bedroom with "guns to [his] face," *see* Tr. 331:19-20, as well seeing 12-13 officers outside the Residence, all carrying "machine guns." *See* Tr. 332:22-333:2. The Court rejects Ortiz's testimony. His demeanor on the stand and his history of ignoring court orders and lying to the Court make him an incredible witness.

The Court rejects Totok's testimony as well. On direct examination, she testified that officers woke her inside her bedroom by shining a flashlight in her face on the morning in question, and that she had never seen so many law enforcement officers in her life. *See* Tr. 362:12-20. She also stated that officers held "machine guns" and that her whole block was "full of cops and everything" when she went outside. *See* Tr. 363:2-11. While Ms. Totok's demeanor on the stand was more credible than Ortiz's, her testimony on cross-examination leaves the Court unwilling

6

to accept her version of events.  Initially, according to Government rebuttal witness Special Agent Michael Cassidy, who testified credibly, he and Ms. Totok spoke one week before the hearing.  *See* Tr. 410:6-427:18.  Yet on the stand, although Totok could clearly recall the events surrounding the March 6, 2020 search clearly, she could not recall her conversation with Special Agent Cassidy about the search a week before the hearing, rendering further cross-examination impossible.  *See id.*  Totok's selective memory at the hearing was incredible, and so the Court rejects her testimony.[4]

The officers then asked Ortiz and Totok to leave the Residence and stay on the front lawn while they searched for King.  *See* Tr. 21:25-22:1.  At approximately the same time, Defendant emerged from a door leading to the ground floor of the Residence, *see* Tr. 22:2-6, and voluntary stated to the officers that:  (i) he knew King; (ii) King was not present at the Residence at that time; and (iii) there may have been another individual on the ground floor of the Residence.  *See* Tr. 23:12-17.  Detective Corso testified that Cruz then gave oral consent for the officers to search the Residence for King.  *See* Tr. 23:14-15.[5]  This interaction lasted approximately one minute, and Cruz then complied with instructions to step outside.  *See* Tr. 24:14-25:11, 30:23-24.

---

[4] Then, despite being unable to recall her conversation from a week earlier, while Totok was in the gallery after she testified, and was listening to Special Agent Cassidy's testimony, she shouted corrections to his testimony so loudly that the Court had to admonish her to be quiet or she would be asked to leave. Because this exchange, however, was omitted from the transcript, the Court does not rely on it in reaching its recommendation.

[5] According to Detective Corso, before Defendant provided consent to search: (1) no firearm was pointed at Cruz; (2) Defendant was not yelled at; (3) Cruz was not pushed; and (4) Defendant was not threatened. *See* Tr. 24:5-13.

### D. Defendant's Pre-Arrest Statements

At the time of the above events, FAST Team officer Michael Filippazzo, then a 10-year law enforcement veteran, was stationed along the Residence's perimeter. *See* Tr. 99:20-22. Officer Filippazzo was dressed in plainclothes and wore a vest with "Police" in reflective lettering on both sides. *See* Tr. 105:12-16. He carried his sidearm on his hip and a pair of handcuffs in his rear pants pocket. *Id.* Officer Filippazzo moved from his position at the rear corner to the front corner of the house, observed Cruz exit the Residence and motioned for Defendant to come over to him. *See* Tr. 109:25-111:11. When Cruz exited the Residence, he was not handcuffed or led out by a law enforcement officer. No firearm was pointed at him. No one was yelling at him or giving him orders, and no one made any physical contact with him. *See* Tr. 112:25-113:10. There is nothing to the contrary in the parties' motion papers or in the testimony offered at the hearing. Further, neither Officer Filippazzo nor any of the FAST Team officers helping him maintain a perimeter around the Residence wore a helmet, pointed a service weapon at Defendant, or carried a rifle, taser, shield or battering ram. *See* Tr. 113:11-114:3.

Cruz walked over to Officer Filippazzo and the two calmly engaged in conversation. *See* Tr. 114:4-22. Officer Filippazzo did not search Defendant, place him under arrest, or make physical contact with Cruz because Defendant was "[l]aid back, very cool, calm and collected" during their conversation. *See* Tr. 114:7-16, 160:1-2. During their conversation, Cruz provided oral consent to Officer Filippazzo

8

for officers to "[g]o ahead and look" for King and "do [their thing]" in searching the Residence. *See* Tr. 116:10- 17.

### E. Defendant's Arrest

While Defendant and Officer Filippazzo were speaking, Detective Corso and approximately three other Task Force officers searched the ground floor of the Residence. Upon entering the ground level, they immediately encountered a bedroom, later determined to be Cruz's, whose door was partially open, and entered to search for King. *See* Tr. 25:17-19. Within the room, Detective Corso observed furniture, including a dresser and a futon, as well as various boxes and other personal effects. *See* Tr. 27:9-12. He also observed a black semi-automatic assault rifle leaning against the door jamb of a closet in Defendant's room. *See* Tr. 27:13-19, Government Exhibit ("GX") 7.1, 7.19. Based on his experience as a law enforcement officer, Detective Corso recognized the weapon as illegal to possess in New York State. *See* Tr. 28:10-12.

As the officers exited the room, Detective Corso also observed a clear plastic bag containing a white powdery substance that he believed to be cocaine. *See* Tr. 28:13-21, GX 7.3. The officers' sweep of Cruz's bedroom lasted approximately 30 to 45 seconds before they proceeded to the clear the rest of the ground floor of the Residence, where they encountered a black male, who had barricaded himself inside a bedroom and required medical attention. *See* Tr. 27:20-28:3, 93:9-15. While King was not located at the Residence, one of the Task Force Officers signaled to Officer Filippazzo that Cruz was to be placed under arrest. *See* Tr. 28:25-29:1, 117:23-24.

Officer Filippazzo then arrested Cruz and cuffed Defendant's hands in front of him (known as "front-cuffing") – a more comfortable option than rear-cuffing (cuffing one's hands behind their back) – because Cruz was "very cooperative and laid back" and Officer Filippazzo "wanted to make him comfortable."  *See* Tr. 119:2-120:3.  The Task Force officers then secured Defendant's bedroom and notified the FAST Team detectives that apparent illegal drugs and an illegal firearm had been discovered.  *See* Tr. 30:1-19.  Cruz was then seated in the front seat of an unmarked police vehicle to await the FAST Team detectives' arrival.  *See* Tr. 121:7-10.  Both Detective Corso and Officer Filippazzo testified credibly that, while at the Residence, no civilians, including Cruz, reentered the Residence.  *See* Tr. 30:8-31:1, 121:19-25.

Officer Filippazzo further testified that, from the time Defendant exited the Residence to the time he was seated in the unmarked vehicle, Cruz was never out of Officer Filippazzo's sight, and that in his 11 years as a law enforcement officer, Officer Filippazzo has never seen an arrestee brought into any crime scene, let alone a crime scene containing a potentially contraband firearm.  *See* Tr. 121:13-122:8.  Cruz's statement in his declaration to the contrary, that he was brought back into the Residence by officers for questioning, was uncorroborated by any hearing testimony and is inherently incredible.

### F. Defendant's Documented Post-Arrest Statements

At approximately 8:20 a.m., Detective Christopher Marksberry – a FAST Team member and 16-year veteran of the SCPD – arrived at, and took responsibility for, the scene.  *See* Tr. 239:23-244:21.  Shortly after, at approximately 8:30 a.m., Detective

Sean Manning – another FAST Team member 14-year law enforcement veteran with both the SCPD and New York City Police Department – arrived to assist Detective Marksberry by photographing the Residence and recovering evidence. *See* Tr. 182:16-189:24. Both detectives had been executing an unrelated search warrant prior to their arrival at the Residence. *See* Tr. 186:5-11, 241:11-18. Neither Detective Marksberry nor Detective Manning had been involved in the Task Force's investigation of King nor was their initial objective that day related to the King investigation. *See* Tr. 189:10-244:17.

Upon his arrival, Detective Marksberry observed five to six officers positioned outside the Residence, including one securing the front door. *See* Tr. 247:10-15. None of the officers observed remained in tactical gear, nor had a firearm drawn. *See* Tr. 247:16-20, 289:25-290:11. To Detective Marksberry, everyone appeared calm. *See* Tr. 247:23-248:3. Further, the officers on scene advised Detective Marksberry that Cruz had "been very cooperative since . . . they met him." Tr. 248:16-17. Detective Corso advised Detective Marksberry that they had received consent from the residents to search the Residence for King and that, during the course of the search, they observed apparent narcotics and a firearm in a basement bedroom. *See* Tr. 246:2-9. Detective Marksberry was also briefed by Officer Filippazzo, who conveyed Defendant's statement that the officers had permission to enter the Residence "to look for [King]." Tr. 246:17-23.

Detective Marksberry conducted a walk-through of the Residence to familiarize himself with the layout and ensure that the premises were safe and

secure.  *See* Tr. 248:23-24.  During the walk-through, Detective Marksberry did not go inside Defendant's bedroom.  *See* Tr. 249:5-24.  After concluding his walk-through, Detective Marksberry requested that Cruz be placed in the front passenger seat of Detective Marksberry's car for the purpose of attempting an interview with Defendant.  *See* Tr. 250:4-7.  Detective Marksberry permitted Cruz to be front-cuffed for the duration of the interview, based on on-scene officers' reports that Defendant had been cooperative.  *See* Tr. 250:10-13.

### G. First *Miranda* Warnings

Within approximately 13 minutes of arriving, Detective Marksberry advised Cruz of his *Miranda* rights and asked Defendant if he (Detective Marksberry) could interview him.  *See* Tr. 252:12-16.  Detective Marksberry testified that, consistent with his usual custom and practice, he read the rights to Defendant verbatim from a card, which Cruz signed at 8:34 a.m.  *See* Tr. 256:19-25, GX 8.  During the interview, Defendant did not ask any questions regarding his *Miranda* rights.  *See* Tr. 255:11-22.  Detective Marksberry provided Cruz with the *Miranda* rights card, and Defendant wrote "yes" next to each of the questions confirming his intention to waive his rights and speak with Detective Marksberry.  *See* Tr. 256:8-12.

Following Cruz's waiver, he made voluntary statements to Detective Marksberry, some of which were memorialized in contemporaneous notes.  *See* Tr. 260:7-24, GX 14.  Defendant stated to Detective Marksberry that he:  (i) had rented a ground floor bedroom in the Residence for approximately three months; (ii) kept a firearm and 30 to 40 grams of cocaine on a dresser inside the bedroom; and (iii) kept

the firearm for protection "because of the stuff that was in his room" after a friend was killed during a drug deal.  *See* Tr. 261:21-262:14.

During the interview, Cruz used Detective Marksberry's phone to call to his son's mother.  *See* Tr. 263:1-2, 263:13-16.  At no point during this call did Defendant claim that he had been threatened or state that the police had entered the Residence without permission.  *See* Tr. 263:24-264:8.

## H. Permission to Search Form

Detective Marksberry next presented Defendant with a Permission to Search form and advised Cruz of two options:  (i) he (Defendant) could sign the form authorizing the officers to conduct a search of his bedroom; or (ii) Cruz could decline to sign the form, and the officers would seek a search warrant.  *See* Tr. 264:18-20. Cruz reviewed and signed the form at 8:44 a.m., which noted his "right to refuse . . . consent," without asking any questions about the options presented to him.  *See* Tr. 267:11-24, GX 10.  Detective Corso signed the form as a witness to the consent.  *See* Tr. 31:10-14, 268:23-25.

## I.  Second *Miranda* Warnings

After the interview concluded and in Cruz's presence, Detective Marksberry converted his interview notes into a statement on a form entitled Advice of Rights. *See* Tr. 270:19-271:4, GX 9.  Before Defendant was asked to review and adopt the statement, Detective Marksberry read Cruz his *Miranda* rights a second time.  *See* Tr. 271:17-21.  According to Detective Marksberry, Defendant again did not ask questions or otherwise indicate that he did not understand those rights.  *See* Tr.

272:3-8. Cruz initialed next to each right as they were read to him to denote his understanding. *See* Tr. 272:20-21.

Detective Marksberry again read Defendant two questions concerning his knowing and voluntary waiver of his *Miranda* rights, and Defendant again wrote "Yes" next to each question – confirming his intention to waive those rights and adopt the statement prepared by Detective Marksberry. *See* Tr. 273:14-274:8. Detective Marksberry testified that, before swearing to it, Cruz was read the full statement and given an opportunity to make changes. *See* Tr. 277:19-24. Defendant requested a correction to the number of months that he had been living at the Residence, but did not request changes to the portion of the statement indicating that he consented to the officers searching the Residence, nor did he request that the statement include: (i) his being forced to sign papers in order to call his son's mother; or (ii) his being brought back into the crime scene for questioning. *See* Tr. 278:16-279:8.

At approximately 9:20 a.m., Cruz signed the statement. *See* Tr. 277:11-15. At approximately 10:02 a.m., after Defendant's interview concluded, Detective Marksberry and Detective Manning entered Cruz's bedroom to photograph the scene and recover evidence. *See* Tr. 199:9-17, 281:21-22, GX 11. That process lasted approximately 30 minutes. *See* Tr. 204:1-4, 282:1-3. The detectives left the Residence at approximately 10:40 a.m. and were back at the FAST Team offices in Hauppauge by 11:10 a.m. *See* Tr. 207:15-24, 208:2.

### J. Defendant's Post-Arrest Cooperation

Cruz was subsequently transported to SCPD's Fourth Precinct, where his movements and interactions with law enforcement were documented in a Prisoner Activity Log. *See* Tr. 281:16-17, GX 13. During those interactions, Cruz never stated that Detective Marksberry threatened him or brought him back into the Residence for unlawful questioning, and did not complain that that the officers had gone inside the Residence without permission. *See* Tr. 126:6-19. In fact, at 12:30 p.m. – approximately six hours after encountering officers at the Residence, and three full hours after making his sworn statement to Detective Marksberry – Defendant voluntarily provided officers with a DNA sample. *See* Tr. 282:22-283:1.

### II.  <u>PROCEDURAL HISTORY</u>

On or about March 11, 2020, by way of sealed Complaint, the Government charged Cruz with:  (i) possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and (ii) knowing and intentional use and carrying of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Compl. The Complaint was subsequently unsealed on April 27, 2020, *see* DE [9], and Defendant was arraigned on September 8, 2020. *See* DE [27]. Cruz filed Defendant's Motion on March 26, 2021, *see* Def. Mot., and the Government filed its opposition on April 16, 2021. *See* DE [43]. On April 26, 2021, Judge Brown referred Defendant's Motion to this Court for report and recommendation as to whether it should be granted. *See* April 26, 2021 Electronic Order. A hearing on

Defendant's Motion was held over three days: June 14-15, 2021, and July 1, 2021. *See* DEs [55], [56], [67].

After the hearing concluded, the parties were permitted to submit post-hearing briefs, *see* DE [67], and did so on July 16, 2021. *See* Defendant Jorly Cruz's Post-Hearing Brief in Support of his Motion to Suppress Physical Evidence and Statements Based Upon an Illegal Search and Seizure ("Def. Mem."), DE [65]; The Government's Post-Hearing Brief in Further Opposition to the Defendant's Motion to Suppress ("Gov. Opp."), DE [64]. For the reasons set forth below, the Court respectfully recommends that Defendant's Motion be denied in its entirety.

## III.  LEGAL STANDARD

Generally, a defendant who moves to suppress evidence that he contends derives from an illegal search "bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). Where the government "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973) (internal quotation marks and citation omitted); *see also United States v. Ofsink*, No. 19-cr-290, 2021 WL 457230, at *7 (E.D.N.Y. Feb. 8, 2021).

16

## IV.    **DISCUSSION**

### A. Seizure of Physical Evidence from Defendant's Bedroom

Initially, Cruz moves to suppress the physical evidence seized from his bedroom as the fruit of an illegal search.  *See* Def. Mem. at 21-28.  The Government, on the other hand, contends that the officers' search of the Residence for King:  (1) "was a valid protective sweep, which was objectively reasonable" after obtaining the consent to search from upstairs residents Ortiz and Totok; and (2) "the weight of credible evidence supports the conclusion that [Defendant] voluntarily consented to a search of the Residence for King, which led to the discovery of drugs and a firearm in plain view in his bedroom."  Gov. Opp. at 19.

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers and effects against unreasonable searches and seizures," U.S. CONST. amend. IV, and warrantless searches inside a home are presumptively unreasonable.  *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1948 (2006).  It is well-settled, however, that the presumption against warrantless searches and seizures is rebuttable in a variety of circumstances, such as one that constitutes a protective sweep – "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  *Maryland v. Buie*, 494 U.S. 325, 337, 110 S. Ct. 1093, 1094 (1990).  And when, during the course of a justified protective sweep, an officer encounters incriminating evidence in plain view, the seizure of that evidence will not violate the Fourth Amendment.  *United States v. Babilonia*, 854 F.3d 163, 179-80 (2d Cir. 2017).

Nor will a search violate the Fourth Amendment when it is conducted pursuant to the voluntary consent of an authorized person. *See Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 1803 (1991). Applying these standards, and for the reasons set forth below, the Court finds that the seizure of physical evidence from Defendant's bedroom was constitutional, and recommends that Defendant's Motion to suppress evidence obtained during the search be denied.

### 1. Officers Acted Lawfully in Conducting Protective Sweep

Law enforcement officers who are executing an arrest warrant inside a home and possess a reasonable suspicion that an individual posing a threat to the officers is present elsewhere on the property, may perform a limited warrantless search – a protective sweep – of the premises. *See Buie*, 494 U.S. at 334, 110 S. Ct. at 1098. In order to do so, officers must have "articulable facts, which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

Such a sweep does not violate the Fourth Amendment if it: (i) is not unnecessarily invasive; (ii) extends only to a cursory inspection of those spaces where a person may be found; and (iii) lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises. *See id.* at 335-36, 110 S. Ct. at 1099. If, however, during a protective sweep, officers observe "patently incriminating evidence in plain view," they may seize the evidence without a warrant. *United States v. James*, 415

18

F. Supp. 2d 132, 147 (E.D.N.Y. 2006), *aff'd* 712 F.3d 79 (2d Cir. 2013); *see also United States v. Badoolah*, No. 12-cr-774, 2014 WL 4793787, at *9 (E.D.N.Y. Sept. 25, 2014).

Applying these standards, the Court finds that the Task Force officers were justified in conducting a protective sweep of the Residence, pursuant to their lawful execution of an arrest warrant for King, whom the officers believed posed a threat of danger. Upon arriving at the Residence, the officers sought and obtained consent from both Ortiz and Totok to search for King inside the Residence. *See* Tr. 21:16-23, 96:16-19. With this consent, the officers were entitled to conduct a protective sweep of the entire house, not merely the rooms occupied by Ortiz and Totok. *See Jimeno*, 500 U.S. at 250-51, 111 S. Ct. at 1803; *see also United States v. Jenkins*, 496 F.2d 57, 72 (2d Cir. 1974) (defendant's sister, "a joint tenant for all practical purposes" who had access to the entire first floor, could consent to a search of the property); *United States v. Awan*, No. 06-cr-0154, 2006 WL 3207858, at *5 (E.D.N.Y. Nov. 6, 2006) (finding that courts within the Second Circuit "have regularly upheld searches of defendants' private spaces within a home where another occupant of the home consented to the search.") (citing *United States v. Trzaska*, 859 F.2d 1118, 1121 (2d Cir. 1988); *United States v. Cataldo*, 433 F.2 38, 40 (2d Cir. 1970)); *Ong v. Park Manor (Middletown Park) Rehabilitation and Healthcare Ctr.*, No. 02-cv-974, 2017 WL 4326540, at *8 (S.D.N.Y. Sept. 28, 2017) (citing *Trzaska*, 859 F.2d at 1120) (finding that, in the United States, a third party may consent to a search so long as they possess "a sufficient relationship to the searched premises to validate the search."); *Young v. Suffolk County*, 922 F. Supp. 2d 368, 391 (E.D.N.Y. 2013) (quoting *Trzaska*,

859 F.2d at 1120) ("Thus, in any third party consent case, the issue to be resolved is whether the consenting party possessed a sufficient relationship to the searched premises to validate the search. Mutual use of property, or joint access or control of property, is generally sufficient.").

Before arriving at the Residence, the Task Force officers learned that King, a known Bloods gang member with prior weapons and narcotics convictions who was also wanted by SCPD's Third Precinct for allegedly firing shots into the home of a girlfriend, might be hiding out at the Residence.  *See* Tr. 14:15-18:9.  Then while standing at the front door, Detective Corso observed a then-unidentified male (later identified as Cruz) looking out a window on the first floor, *see* Tr. 20:22-21:9, and did not know whether King or anyone else might be present in the Residence, especially after Defendant told him that there may have been another individual on the ground floor.  *See* Tr. 23:12-17.

Taken together, these facts illustrate that the Task Force officers possessed articulable facts sufficient to support a "reasonable suspicion" that King, or some other person posing a threat to officer safety, may have been hiding in one of the rooms on the ground floor of the Residence, justifying their protective sweep.  *See, e.g., United States v. Mickens*, 926 F.2d 1323, 1328 (2d Cir. 1991) (upholding protective sweep where officers "had reason to believe [the individual sought] was a drug dealer who was known to be violent and who travelled with others"); *United States v. Sylla*, No. 08-cr-906, 2010 WL 582575, at *12, n. 14 (E.D.N.Y. Feb. 16, 2010) (denying motion to suppress where agents conducted a protective sweep after

occupant advised that other people were inside the house); *James*, 415 F. Supp. 2d at 148 (acknowledging concern about presence of third party in residence as a factor justifying protective sweep); *United States v. Medina*, 301 F. Supp. 2d 322, 332 (S.D.N.Y. 2004) (acknowledging "at least the possibility" of presence of a third party as a factor justifying protective sweep). Accordingly, the Court finds that it was permissible for the agents to protectively sweep the Residence as part of their search for King.

### 2. Incriminating Evidence Was Seized in Plain View

The Court further concludes – and the parties do not dispute – that the evidence leading to Defendant's arrest was in plain view in his bedroom. *See generally* Def. Mem., Gov. Opp. Upon entering, Detective Corso observed: (i) a black semi-automatic assault rifle leaning against the door jamb of a closet in Defendant's room, *see* Tr. 27:13-19, GX 7.1, 7.19; and (ii) a clear plastic bag containing a white powdery substance that he believed to be cocaine. *See* Tr. 28:13-21, GX 7.3. Accordingly, the Court concludes that this evidence was lawfully seized while in plain view. *See United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017); *see also Ruggiero v. Krzeminski*, 928 F.2d 558, 562 (2d Cir. 1991) (finding that the "plain view" doctrine "is associated only with the seizure of items" that are in plain view); *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 2136-37 (1993) ("[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.").

3.   <u>Officers Obtained Knowing & Voluntary Consent to Search Bedroom</u>

The Court next analyzes whether the Government has established that the officers obtained knowing and voluntary consent to search Defendant's bedroom, even in the absence of a lawful protective sweep.  When determining whether an individual has voluntarily consented to a search by law enforcement, courts typically consider the individual's age, education, intelligence, length of detention, whether questioning was repeated and prolonged, use of physical punishments or deprivations, and whether the person was advised of his constitutional rights.  *See Sylla*, 2010 WL 582575, at *7 (citing *Schneckloth*, 412 U.S. at 226, 93 S. Ct. at 2047; *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986), *cert. denied*, 479 U.S. 827, 107 S. Ct. 106 (1986)).

Further, when consent is obtained from an individual in custody, courts also consider whether the officers' guns were drawn, as well as whether the consenting person was frisked or threatened, in a public area, or informed of the option of refusing consent.  *See id.* (quoting *Puglisi*, 790 F.2d at 243).  Notably, courts have repeatedly held that individuals can validly consent to law enforcement searches despite the use of handcuffs, the presence of unholstered firearms and other activities consistent with the police presence involved in the apprehension of a fugitive.  *See United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) ("The fact that police drew their guns to effectuate the arrest does not necessarily establish coercion, neither does the fact that [the defendant] was handcuffed.") (citations omitted); *see also United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) ("[N]either the fact that a

person is in custody nor that [he] has been subjected to a display of force rules out a finding of voluntariness."); *United States v. Faltine*, No. 13-cr-315, 2014 WL 4370811, at *14-15 (E.D.N.Y. Sept. 2, 2014) (discrediting defendant's contention that "he gave consent under duress, in light of the agents' drawn weapons, his state of undress, and being placed under arrest and questioned about possessing any guns or drugs.").

Under these standards, the Court finds that the evidence establishes that when Defendant emerged from the ground floor of the Residence, he made uncoerced, voluntary statements to officers that:  (i) he knew King; (ii) King was not present at the Residence then; and (iii) there may have been another individual on the ground floor of the Residence, *see* Tr. 23:12-17, and voluntarily provided officers with oral consent to search.  *See* Tr. 23:14-15.  In support of this conclusion, the Court notes that when Cruz exited the Residence, he was not handcuffed or led out by an officer at gunpoint, nor was he yelled at by anyone present.  *See* Tr. 112:25-114:3.  Indeed, he walked over to Officer Filippazzo freely and proceeded to have an amicable conversation.  *See* Tr. 114:4-6, 114:21-22.  Defendant was of sufficient age and intelligence and the questioning was not repeated or prolonged, and there was no physical punishment or deprivation.  Further, during the course of these events, Cruz was informed of his constitutional rights more than once.  *See* Tr. 31:10-14, 116:10-17, 252:12-16, 255:11-256:25, 264:18-20, 267:11-24, 268:23-25, 273:3-274:8, 277:19-24, 278:16-279:8.

Based on the facts, the Court concludes that even if the protective sweep was otherwise unlawful, the officers nevertheless obtained Cruz's voluntary consent to

search his bedroom. *See Ansaldi*, 372 F.3d at 129-30 (finding consent legally sufficient, despite drawing of firearms and handcuffing, where "the agent essentially asked [the defendant], 'Can we search your house?,' to which [the defendant] responded in the affirmative."); *see also United States v. Zubiate*, No. 08-cr-507, 2009 WL 483199, at *5-6 (E.D.N.Y. Feb. 25, 2009) (finding consent to be voluntary where officers had weapons drawn "only as a precaution when entering the premises, and there is no evidence that either used his gun in a manner that coerced [the defendant] to consent to a search of his apartment."). Accordingly, the Court concludes that the evidence from the bedroom search was lawfully obtained, and the motion to suppress the evidence should be denied.

4. <u>The Officers' Discovery of Defendant's Assault Rifle & Drugs Was Inevitable</u>

The Government further contends that, even if Cruz did not give lawful consent for the search, the officers' seizure of evidence from Defendant's bedroom was inevitable because the assault rifle and illegal drug paraphernalia were discovered in plain view during a permissible protective sweep of the Residence, and would have provided the basis to obtain a search warrant for Cruz's bedroom. *See* Gov. Opp. at 33-34.

The inevitable discovery exception to the exclusionary rule "allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Whitehorn*, 829 F.2d 1225, 1230 (2d Cir. 1987) (quoting *Nix*

24

*v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 2509 (1984)), *cert. denied*, 487 U.S. 1237, 108 S. Ct. 2907 (1988).

In applying this exception, the court must determine, "viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992). "[P]roof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings.' " *Id.* (emphasis omitted) (quoting *Nix*, 467 U.S. at 444, 104 S. Ct. at 2509). As the Supreme Court explained in *Nix*:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.

*Nix*, 467 U.S. at 443, 104 S. Ct. at 2509.

Applying these standards, and because Defendant does not explicitly oppose the Government's contention, *see generally* Def. Mem., the Court concludes that a search warrant for seizure of the gun and drugs would have been sought and obtained by one of the Assistant District Attorneys ("ADA") assigned to the FAST Team, based on the evidence observed in plain view during the initial protective sweep. *See Whitehorn*, 829 F.2d at 1230; *see also United States v. Jackson*, No. 19-cr-6026, 2020 WL 810747, at *11 (W.D.N.Y. Feb. 19, 2020), *report and recommendation adopted*,

No. 19-cr-6026, 2020 WL 1557416 (W.D.N.Y. Apr. 1, 2020); *United States v. Monzon-Luna*, No. 11-cr-722, 2013 WL 6175818, at *7, n. 8 (E.D.N.Y. Nov. 22, 2013).

Specifically, Detective Corso testified that during the protective sweep, he immediately identified the assault rifle and drug paraphernalia as illegal contraband. *See* Tr. 5:12-21. Detective Marksberry testified that he could have used this information to obtain a search warrant from one of the ADAs assigned to assist the FAST Team with warrant applications and preparation. *See* Tr. 265:21-266:1.

Moreover, this testimony, when combined with the fact that officers were securing the Residence to prevent any opportunity for evidence tampering, *see* Tr. 13:2-4, leads the Court to conclude that recovery of the assault rifle, drugs, and drug paraphernalia from Defendant's bedroom was inevitable. *See United States v. Lavan*, 10 F. Supp. 2d 377, 389-90 (S.D.N.Y. 1998) (applying inevitable discovery doctrine where the "great strength of the government's evidence of probable cause…demonstrates that there was no material risk that the warrant would not have issued" and "[t]here was no risk of disappearance of the evidence pending execution of a warrant, as the apartment was surrounded and the physical nature of the evidence made its destruction or disposal in these circumstances virtually impossible."); *see also United States v. Price*, No. 17-cr-301, 2017 WL 4838307, at *7 (E.D.N.Y. Oct. 23, 2017) (concluding that "even if the seizure of the two telephones was not lawful, there was sufficient independent evidence that would lead to a magistrate judge inevitably issuing a warrant to seize the telephones. As a result, the two telephones, and the evidence obtained through those phones, are not subject

to suppression."). Accordingly, the Court finds that, based on the evidence offered by the Government and Cruz's lack of opposition, the officers' seizure of evidence from Cruz's bedroom was inevitable.

### B. Voluntariness of Defendant's Statements to Law Enforcement

Cruz next seeks to suppress his statements made to law enforcement on March 6, 2020, contending that they were unlawfully coerced. *See* Def. Mem. at 28-30. It is well settled that a defendant's confession to law enforcement is inadmissible "if it was obtained by 'techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will.'" *United States v. Levy*, 217 F. Supp. 3d 643, 661 (E.D.N.Y. 2016) (quoting *Oregon v. Elstad*, 470 U.S. 298, 304, 105 S. Ct. 1285, 1290 (1985)). Courts typically consider the totality of circumstances when determining whether a confession was voluntary or coerced. *See id.* at 661-62. When making such a determination, courts analyze: (i) the characteristics of the accused; (ii) the conditions of interrogation; and (iii) the conduct of law enforcement officials. *See id.* at 669 (finding confession voluntary because – among other things – defendant had been arrested on six prior occasions and he failed to establish that he was subjected to any coercive conditions of interrogation).

Applying these standards to the evidence adduced at the hearing, the Court finds that, based on the totality of the circumstances, neither Defendant's confession nor his consent to search were coerced. Specifically:

- Detective Marksberry read Cruz his *Miranda* rights verbatim from a card, which Defendant signed without

asking any questions, in acknowledgement and waiver of those rights. *See* Tr. 252:12-16, 255:11-22, 256:8-25, GX 8;

- Defendant's extensive prior experience with law enforcement familiarized him with his rights. For example, he was arrested: (i) in 2013 for strangulation; (ii) in January 2018 for assault with intent to cause physical injury; (iii) in March 2018 for criminal contempt, cocaine and marijuana possession, evidence tampering and disorderly conduct; and (iv) in May 2018 for driving while intoxicated ("DWI"). *See* Tr. 259:8-260:2, 306:8-13 (In DWI cases, *Miranda* warnings are given to arrestees "every time.");

- Before Defendant was asked to review and adopt his written statement containing a voluntary admission, Detective Marksberry read Cruz his *Miranda* rights a second time. *See* Tr. 271:17-21;

- Cruz again did not ask any questions or indicate that he did not understand his *Miranda* rights before initialing next to each of the rights, to denote his understanding. *See* Tr. 272:3-8; Tr. 272:20-21;

- Detective Marksberry again read Defendant two questions concerning his knowing and voluntary waiver of his *Miranda* rights, and Defendant again wrote "Yes" next to each question – confirming his intention to waive those rights and adopt the statement prepared by Detective Marksberry. *See* Tr. 273:14-19, 273:22-274:8;

- Defendant was provided with the opportunity to make any changes to the statement before swearing to it, *see* Tr. 277:19-24, and requested an alteration to correct the number of months that he had been living at the Residence, but did not request changes to the portion of the statement indicating that he consented to the officers searching the Residence. *See* Tr. 278:16-279:8.

- During the interview, Cruz used Detective Marksberry's phone to call to his son's mother, and at no point during

this phone call did Defendant claim that he had been threatened or state that the police had entered the Residence without permission.  *See* Tr. 263:1-264:8; and

- Defendant voluntarily signed a Permission to Search form. *See* Tr. 267:11-24, GX 10;

In reaching this conclusion, the Court rejects Defendant's arguments that his consent was not voluntary because Cruz was handcuffed during his interview with Detective Marksberry, and because the presence of officers at the Residence on March 6, 2020 "vitiate[ed] any atmosphere which would support free will."  Def. Mem. at 30-31.  It is well-settled that the reasonable use of handcuffs does not render a confession involuntary, because "the fact of custody alone has never been enough in itself to demonstrate a coerced confession."  *Sylla*, 2010 WL 582575, at *9.  Further, to the extent any officer may have worn tactical gear during the initial approach to the house, those items had been removed and replaced by plainclothes, jackets bearing the word "Police" and holstered sidearms.  *See* Tr. 247:16-20, 289:25-290:2, 290:7-11.  Accordingly, based on the totality of the circumstances, Defendant's statements to law enforcement were not coerced, and the motion to suppress Cruz's statements to the officers should be denied.

### C. Any "Taint" from the Officers' Entry Had Sufficiently Dissipated

Cruz next argues that his statements made "after the illegal search and seizure are tainted and inadmissible."  Def. Mem. at 8.  In response, the Government contends that even if Cruz's initial verbal consent to officers was somehow compromised by their initial entry into the Residence, the evidence adduced at the hearing established that Defendant continued making knowing and voluntary

statements, both consenting to the search and incriminating himself, far after any alleged "taint" had dissipated.  Gov. Opp. at 31-33.

Courts consider the following factors in determining whether consent given after an allegedly illegal search is valid:  (i) giving of *Miranda* warnings; (ii) temporal proximity of the illegal entry and the alleged consent; (iii) presence of intervening circumstances; and (iv) purpose and flagrancy of the "official misconduct." *See Kaupp v. Texas*, 538 U.S. 626, 633, 123 S. Ct. 1843, 1847 (2003) (citation omitted); *see also United States v. Bailey*, 743 F.3d 322, 341 (2d Cir. 2014); *United States v. Lambis*, 197 F. Supp. 3d 606, 612 (S.D.N.Y. 2016); *United States v. Colon-Gentile*, No. 12-cr-777, 2014 WL 2157541, at *6 (E.D.N.Y. May 23, 2014).

Considering these factors, the Court concludes that a sufficient amount of time had passed between the officers' entry into the Residence and Cruz's statements to law enforcement, such that any "taint" had dissipated.  Specifically, this conclusion is based on evidence that:

- Over two hours passed between Cruz's first verbal consent permitting officers to search the Residence and when he signed a Permission to Search form allowing a further search of his bedroom, and twice received and waived his *Miranda* rights, before making the statements at issue under penalty of perjury.  *See* Tr. 23:12-17, 267:11-24, GX 10;

- Defendant had engaged in a conversation with Officer Filippazzo, during which he gave consent for officers to "[g]o ahead and look" for King and "do [their thing]" in searching the Residence.  *See* Tr. 116:10- 17; and

- After that conversation with Officer Filippazzo, Cruz was placed in the front seat of a vehicle with Detective

30

Marksberry, who was not involved in the initial entry into the Residence and who never drew a firearm, touched Cruz or threatened him in any way, and allowed him to make a phone call to the mother of his child during the interview. *See* Tr. 121:7-10.

Based on these facts, the Court finds that Cruz's written consent to search his bedroom and waiver of his *Miranda* rights are sufficiently attenuated from the officers' initial entry into the Residence, such that even if the officers' initial search was unlawful, Defendant's subsequent consent cured any deficiency.   *See United States v. Snype*, 441 F.3d 119, 134-35 (2d Cir. 2006) (finding consent to search sufficiently attenuated despite being obtained approximately "twenty minutes" after the defendant's girlfriend's home was forcibly entered by a SWAT team, defendant and girlfriend were handcuffed, and law enforcement agents raised the possibility that they would take the two into custody and place the girlfriend's young daughter in protective custody); *see also United States v. Oguns*, 921 F.2d 442, 448 (2d Cir. 1990) (finding the "intervening act" of signing consent form sufficient to purge taint even though it occurred "only…a few minutes" after illegal entry); *United States v. Bartee*, No. 13-cr-365, 2013 WL 6164339, at *11-12 (S.D.N.Y. Nov. 12, 2013) (finding "ten to fifteen" minute lapse of time between arrest and signing of consent form, along with police conversation with defendant and review of consent to search form, were "sufficient to dissipate…taint" of alleged violation).   Accordingly, and for all of these reasons, the motion to suppress Defendant's voluntary statements should be denied.

## V.   **CONCLUSION**

For the reasons set forth above, the Court respectfully recommends that Defendant's Motion be denied in its entirety.

## VI.   **OBJECTIONS**

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.   Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report.   Failure to file objections within the specified time waives the right to appeal the District Court's order.   *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, No. 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


Dated:      Central Islip, New York
            August 13, 2021

                                        /s/ Steven I. Locke
                                        STEVEN I. LOCKE
                                        United States Magistrate Judge